IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JEANNETTA HARTLEY,            )
                              )
            Plaintiff,        )
                              )
vs.                           )   Case No. 11-4295-CV-C-ODS
                              )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security, )
                              )
            Defendant.        )

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying her application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in April 1976, has a college degree in fashion marketing, and has prior work experience as hostess/waitress, secretary/receptionist, customer service representative and in retail. R. at 24-25. She previously applied for benefits in 2005 and 2006, but those applications were denied. The present case arises from two applications for benefits: one under Title II in March 2009 and one under Title XVI in August 2009. She originally alleged on onset date of August 2005, but in January 2011 – four months before the hearing before the ALJ – amended her onset date to August 12, 2009.

The Record includes medical and other evidence from before August 2009, but there is no need to detail all of it. Plaintiff alleged she was disabled due to a combination of lupus (and lupus-related kidney problems), arthritis, depression, and exhaustion. From at least May 2004 to the present, Plaintiff has been diagnosed as suffering from

class II lupus nephritis, and until November 2009 her treating rheumatologist was Dr. Daniel Jost. Plaintiff was treated with Prednisone and Plaquenil and her condition was largely controlled (and, as noted, Plaintiff's disability claims from 2005 and 2006 were denied). In February 2009, Dr. Jost noted Plaintiff had not achieved full remission and commenced treatment with Cellcept, expressing a plan to continue the Cellcept for two years. R. at 353-54. In late March 2009, Plaintiff reported "some difficulty" in performing a wide range of routine tasks, "much difficulty" walking two miles and dealing with feelings of nervousness, anxiety, and depression, and an inability to get a good night's sleep. R. at 347. Two weeks later, Plaintiff reported she was getting worse in these areas, and Dr. Jost became concerned that Plaintiff might be suffering from neuro-psychiatgric lupus. R. at 344-46. In June 2009 Plaintiff reported that she was improving and able to concentrate better. Nonetheless, while Plaintiff's lupus appeared to be stable, Dr. Jost's concerns about possible effects on Plaintiff's brain continued and he indicated that it might be appropriate to discontinue the Prednisone. R. at 340-41.

At her boyfriend's urging, Plaintiff was admitted to the Missouri Psychiatric Center on August 5, 2009, reporting "uncontrollable outbursts," feelings of depression, anxiety, guilt, and difficulty concentrating and sleeping. R. at 399-400. She also reported suicidal thoughts, with a plan to drink and overdose. R. at 414. Her GAF score on admission was 40. Plaintiff was discharged on August 11, 2009, with a diagnosis of major depressive disorder, recurrent, alcohol abuse, and personal/relational problems. Her GAF score on discharge was 45/55 and she no longer indicated suicidal thoughts. Plaintiff was described as stable and was noted to have improved sleep with a prescription of Ambien. R. at 622-24.

Plaintiff kept an appointment at Burrell Behavioral Health ("Burrell") on September 23, 2009. She reported that she had stopped using alcohol on August 12, 2009, and had not used any other drugs since the beginning of 2009. She reported that "she was drinking and getting angry a lot, and decided to stop drinking, but found she was still getting real angry with people." She indicated the problem became worse when she was diagnosed with lupus in 2005 – but, as stated she also indicated she had not stopped drinking until August 2009. Plaintiff also described feeling depressed and moody and

having difficulty sleeping. Her GAF was 50, and she was diagnosed as suffering from bipolar affective disorder and alcohol abuse. R. at 474.

On September 28, 2009, Plaintiff went to the emergency room with a strong headache and later that day saw Dr. Jost. She told Dr. Jost that she had been experiencing intermittent numbness in her right arm for the prior three weeks. Dr. Jost noted "[t]he issues of anger and alcohol use apparently are improved," described her lupus as "stable," and indicated overall that he thought she was "doing well." He referred Plaintiff for a nerve conduction study in her right arm. R. at 595-96. The nerve conduction study was performed on October 15 and showed "denervation and renervation changes in tested muscle but paraspinals could not be sampled due to pain." The report also indicates a need to conduct an MRI of Plaintiff's spine. R. at 489.

Plaintiff returned to Burrell on October 22, seeking "treatment for depression and relationship issues." Her complaints included depression, difficulty sleeping, low energy, and inexplicable crying spells. She was diagnosed with major depressive disorder, assessed a GAF score of 55, and prescribed Cymbalta. R. at 468-72. Two weeks later she reported her depression was better (although she had "slipped" and consumed alcohol). R. at 462. The same day she made that report, however, Plaintiff was admitted to Missouri Psychiatric Center "following an anger outburst with her boyfriend during which she started to feel urges of hurting herself and other people, and these urges started to intensify to where she felt she needed to come to the hospital." R. at 632. Despite denying suicidal thoughts when she was at Burrell previously, Plaintiff reported drinking alcohol in an attempt to end her life three weeks prior. Plaintiff was discharged from Missouri Psychiatric Center on November 12. Plaintiff's GAF on discharge remained 55. R. at 631-32.

Plaintiff returned to Burrell on December 3, reporting she had anger outbursts daily, felt depressed, and had low energy and motivation and difficulty sleeping. She made similar statements on December 17. In January 2010, Plaintiff reported that she last consumed alcohol in November 2009. Before that, she had walked away from jobs or been fired due to anger and the longest she had ever held a job was approximately one year. Later that month, Plaintiff reported that her mood was better.

3

Plaintiff went to the Rheumatology Clinic at University Hospital on January 5, 2010, for evaluation of her lupus. By this time, Dr. Jost was no longer Plaintiff's treating physician. The assessment indicated Plaintiff's lupus "appears to have been mild in severity without any history of significant kidney or hematologic disease." Plaintiff was "doing well" on Cymbalta and she was encouraged to continue receiving treatment at Burrell. Plaintiff's white blood count was low and she exhibited hypermobility in her elbows, but the doctor arranged for a battery of blood and other tests and set her next appointment for the following month. R. at 646-47. At that appointment, Plaintiff's white blood count was "stable" and she complained of achiness. Plaintiff continued to complain of a variety of aches in her extremities and limbs.

In September 2010, Plaintiff was admitted to Greenville Memorial Hospital. Her boyfriend had kicked her out of his house, and she had become depressed and suicidal while staying in a shelter. She was not actively suicidal at the moment of her admission, but complained of being "very depressed, despondent" and hoping to fall asleep and not wake up. Plaintiff's niece indicated she could stay with her in Columbia but it would be some time before Plaintiff could do so. R. at 687-88.

In December 2010 Plaintiff was seen at the Rheumatology Clinic. Plaintiff admitted she had missed her medication for two of the preceding five months. Nonetheless, her condition was described as being in remission and stable. The swelling in her joints had also diminished. R. at 670-74.

Plaintiff returned to the Rheumatology Clinic in February 2011. Plaintiff's lupus was noted to be active and her Prednisone dosage was increased from 2.5 milligrams to 20 milligrams. The doctor made no other findings or diagnoses of note. Plaintiff reported increased joint pain, but there were no other diagnostic findings. R. at 719-20. In March, Plaintiff reported feeling "a bit better" and experiencing decreased fatigue and joint pain. The 20 milligram dosage was to continue until the lab results came back and it could be confirmed that the lupus was again in remission. The Record does not include the lab results.

The administrative hearing was held on May 26, 2011. Plaintiff testified that she could not work as a receptionist because she was easily annoyed and frustrated around

4

people.  She estimated she could lift no more than fifteen pounds, which (along with her anger issues) precluded her from working as a waitress.  R. at 26.  Plaintiff also testified that she experiences exhaustion, joint pain and headaches that make it difficult to function.  R. at 27-28.  Joint pain also limits her ability to stand and sit.  R. at 31.  With regard to depression, Plaintiff testified that she feels depressed "pretty much every day" and that when she feels depressed she does not want to live.  R. at 31-32, 37.  Once a month she has manic episodes during which she becomes violent.  R. at 32.

A medical expert – Dr. Albert Owinjabriona[1] – reviewed Plaintiff's medical records and testified at the hearing.  He first indicated Plaintiff did not meet or equal any listed impairments because Plaintiff did not suffer from any end-organ damage sufficient to satisfy those requirements.  R. at 24, 38.  He noted that as recently as December 2010 Plaintiff's lupus was not active and the records indicated she could function at the light level of exertion.  R. at 38.  He described treatment with Prednisone as "one of the first line treatment[s] that you use and also they use that for mild disease too."  R. at 40.  He further described the dosage prescribed in December 2010 – 2.5 milligrams – as "a tiny dose."  R. at 40-41.[2]

A vocational expert ("VE") testified in response to hypothetical questions.  She was first asked to assume a person of Plaintiff's age, education and experience who could perform sedentary work and also needed to avoid extreme temperatures, could understand, remember, and carry out short and simple instructions, and maintain attention and concentration on simple tasks.  The hypothetical also assumed the claimant was limited to low stress environments consisting of no more than occasional decision making and no more than occasional changes and to "superficial" contact with the public and occasional contact with co-workers and supervisors.  Finally, the individual would miss one day a month due to medical reasons.  The VE testified such a person could not return to her past relevant work, but could perform work as a

---

[1] Dr. Owinjabriona's name appears to have been spelled several different ways.  The Court will use the spelling that appears in the hearing transcript.

[2] A consulting psychologist – Paul Horton, Ph.D. – also testified from Plaintiff's records.  There is no need to detail his testimony.

5

Case 2:11-cv-04295-ODS   Document 24   Filed 09/25/12   Page 5 of 8

surveillance system monitor, a semiconductor bonder, or an eyeglass frame polisher. R. at 44-45. When asked whether there were any conflicts between her testimony and the information contained in the Dictionary of Occupational Titles ("DOT"), the VE testified there were not. R. at 45. When the hypothetical was changed to increase the number of monthly absences, the VE testified that a person missing three or more days would not be able to maintain employment, but a person missing two to three days would be "tolerated." R. at 45-46. In response to questions from Plaintiff's attorney, the VE testified that a restriction on working near fluorescent lighting would preclude employment. R. at 46.

The ALJ found Plaintiff could perform "at least" the exertional demands of sedentary work and further had the non-exertional limitations described in his first hypothetical posed to the VE. R. at 15. Based on the VE's testimony, the ALJ found Plaintiff could not perform her past work, but retained the residual functional capacity to work as surveillance systems monitor, semi-conductor bonder, or an eyeglass frame polisher. R. at 18-19.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

## A. The Onset Date

The ALJ's written opinion is premised on Plaintiff's original alleged onset date of August 2005. Apparently, the ALJ failed to acknowledge Plaintiff's amendment of the onset date to August 12, 2009. The parties agree there is a paucity of law addressing this situation. They also agree that the few cases on the issue indicate such an error requires reversal only if the error prejudices the claimant. E.g., Ehrob v. Commissioner of Social Security, 2011 WL 77514 (E.D. Mich. 2011); Hinchey v. Barnhart, 2007 WL 104765 (W.D. Va. 2007). The Court discerns no prejudice.

While the starting place for analysis should be the alleged onset date, it must also be remembered that an ALJ may consider evidence outside the alleged disability period if doing so helps place the relevant evidence in context. Thus, at worst the ALJ "overdecided" this case by evaluating whether Plaintiff was disabled for time periods that were not at issue in light of the amended onset date. The outcome would be different if the ALJ had considered a time period that did not include the alleged onset date by, for instance, using a later onset date than the one alleged. Plaintiff's argument that she was prejudiced essentially is that the ALJ considered "too much" evidence – but the Court is not convinced that considering "too much" evidence caused the ALJ to consider the post-August 2009 evidence in an improper manner, or that Plaintiff was otherwise prejudiced by the error.

## B. Records from 2011

Plaintiff faults both the ALJ and Dr. Owinjabriona for failing to specifically discuss the medical records from February and March 2011. Plaintiff argues this evidence came from Plaintiff's treating physician, so it was entitled to deference. While Plaintiff is correct in characterizing it as evidence from Plaintiff's treating physician, it does not contain any opinions or recommendations to which deference is due. These records constitute additional medical evidence: the Court has considered whether they deprive the ALJ's decision of support from substantial evidence and concludes they do not. The 2011

7

records indicate Plaintiff's lupus flared up and her Prednisone was increased from 2.5 milligrams to 20 milligrams. Plaintiff's symptoms subsided, causing her doctor to believe that her lupus was under control once again. This temporary activity does not deprive the ALJ's findings of necessary support from the Record as a whole.

Plaintiff does not present any other arguments contesting the ALJ's factual findings.

### C. Inconsistencies with the DOT

Plaintiff argues the jobs identified by the VE are categorized as requiring level 2 or 3 reasoning development in the DOT. This allegedly conflicts with the ALJ's finding that Plaintiff is limited to short and simple instructions, and the VE failed to acknowledge this conflict. Plaintiff's argument is foreclosed by the Eighth Circuit's decision in <u>Moore v. Astrue</u>, 623 F.3d 599, 604-05 (8th Cir. 2010).

IT IS SO ORDERED.

DATE: September 25, 2012

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT

8